**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSE BUSANET,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **No. 21-4286** |
| **JOHN E. WETZEL and** | : | |
| **PA DEPARTMENT OF CORRECTIONS,** | : | |
| **Defendants.** | : | |

**McHUGH, J.**                                                     **August 4, 2023**

## MEMORANDUM

This is an action against the Pennsylvania Department of Corrections ("DOC") and the former Secretary of the DOC, John E. Wetzel, alleging violations of the Eighth and Fourteenth Amendments brought by an individual who spent twenty years in solitary confinement.  Plaintiff Jose Busanet alleges that Defendants kept him in solitary confinement despite knowing that he had mental illnesses that would be severely exacerbated by such conditions, and that they did so without penological justification or providing means to challenge such conditions.  It is one in a series of cases brought pro se raising virtually identical claims consolidated for resolution of common issues of law.[1]

Defendants move to dismiss all claims on the basis that they are untimely, and Secretary Wetzel individually moves to dismiss Busanet's Fourteenth and Eighth Amendment claims as

---

[1] The Court is grateful to the Pennsylvania Institutional Law Project for assuming representation in this case, and grateful to the Office of the Attorney General for the collegial and cooperative manner in which it has been litigated.

barred by qualified immunity.[2]  I conclude that dismissal on statute of limitations grounds is not

warranted, and that qualified immunity bars Mr. Busanet's Fourteenth Amendment claim but not

his Eighth Amendment claim.

## I.      Factual Allegations

In March 1999, Plaintiff Busanet entered a DOC prison pursuant to a death sentence.  Am.

Compl. at ¶¶ 9, 22.  He was placed in solitary confinement in the Capital Case Unit ("CCU"), and

he remained there for the next twenty years.  *Id.* at ¶¶ 27.  During this time, he was deprived of

meaningful social interaction, adequate physical exercise, and human touch.  *Id.* at ¶ 1.

Mr. Busanet alleges that Defendants kept him in solitary confinement with no means to

challenge that confinement, despite knowledge of his mental illness diagnoses and the grave

impact that solitary confinement has on people with those mental illnesses.  *Id.* at ¶¶ 2, 5.  He

further alleges that his time in solitary confinement exacerbated his pre-existing mental illnesses,

caused him severe psychological harm, and caused or worsened various physical ailments that last

to this day.  *Id.* at ¶ 4.

### A.   Allegations as to Busanet's history of mental illness and Defendants' awareness of that history

Busanet's Amended Complaint outlines a history of mental illness that dates back to his

childhood.  As a child, Mr. Busanet was subjected to severe, persistent physical, emotional, and

verbal abuse, and he experienced significant psychological, behavioral, and cognitive difficulties.

*Id.* at ¶¶ 12-13.  Additionally, he experienced multiple head injuries as a child; he was hospitalized

for psychiatric treatment when he was ten years old; and he attempted to commit suicide several

---

[2] In addition to his Eighth and Fourteenth Amendment claims against Wetzel, Busanet also brings claims against the DOC under the Americans with Disabilities Act and the Rehabilitation Act.  These claims are not discussed in this memorandum except as they pertain to the statute of limitations issue.

times as a teenager. *Id.* at ¶¶ 14-16. He was incarcerated at Rikers Island in New York in his late teens and twenties, where he was stabbed multiple different times. *Id.* at ¶ 17.

Mr. Busanet's criminal defense counsel retained a forensic psychiatrist in 2004, who diagnosed Busanet with the following conditions: Schizoaffective Disorder, Bipolar Type; Posttraumatic Stress Disorder, Chronic; Dementia Due to Head Trauma and Developmental Abnormalities with Behavioral Disturbance; Learning Disorder Not Otherwise Specified; Borderline Intellectual Functioning; Borderline Personality Disorder; and Antisocial Personality Disorder. *Id.* at ¶ 18. The psychiatrist determined to a reasonable degree of medical certainty that Mr. Busanet suffered from these conditions as far back as 1997, the year the crime for which he was convicted occurred. *Id.* at ¶ 19. The same psychiatrist conducted another report in 2009, in which he confirmed his previous diagnoses, except for replacing his diagnosis of Schizoaffective Disorder, Bipolar Type with a diagnosis of Bipolar I Disorder and adding a diagnosis of Paranoid Personality Disorder. *Id.* at ¶ 20. He again determined to a reasonable degree of medical certainty that Mr. Busanet suffered from these conditions at the time of his crime in 1997. *Id.*

Prior to entering into DOC custody, Mr. Busanet was incarcerated at Berks County Jail. *Id.* at ¶ 24. While there, Defendant John Wetzel was Mr. Busanet's counselor. *Id.* Busanet participated in multiple group therapy sessions with Wetzel, who became personally familiar with Busanet's history of mental illness. *Id.* at ¶¶ 24-25. Wetzel also knew that Busanet was receiving treatment for his mental illness while incarcerated at Berks. *Id.* at ¶ 26. Defendant Wetzel later became Secretary of the DOC in 2011. *Id.* at ¶ 10. He served as Secretary until October 1, 2021 and was the highest-ranking official in the DOC during that time, approving all DOC policies and overseeing and administering the DOC prison system. *Id.*

Once convicted, Busanet entered DOC custody and was placed in solitary pursuant to a DOC policy that automatically placed all death-sentenced individuals in permanent solitary confinement. *Id.* at ¶¶ 27-28. Throughout his incarceration in the DOC, Busanet's mental illnesses and cognitive impairments worsened, substantially limiting several major life activities, including his concentration, memory, communication, sleeping, and thinking. *Id.* at ¶ 21. In addition to general depression, suicidality, and mental illness symptoms, Busanet alleges that he experienced the following mental and emotional symptoms while in solitary confinement:

1. ruminations;

2. intrusive thoughts;

3. oversensitivity to external stimuli;

4. irrational anger;

5. irritability;

6. difficulty with attention and memory;

7. obsessive behaviors; and

8. a tendency to withdraw.

*Id.* at ¶ 85. Mr. Busanet also alleges that he developed the following physical symptoms and conditions as a result of years spent in solitary confinement:

1. joint pain in his knees and feet;

2. back pain;

3. migraine headaches;

4. stomach ulcers;

5. obesity;

6. high cholesterol; and

7.      pre-diabetes.

*Id.* at ¶ 84.

Busanet alleges that the DOC was well aware of his history of mental illness and suicidality throughout his imprisonment.  *Id.* at ¶ 22.  When Busanet first entered in DOC in March 1999, DOC staff noted his history of depression in their records.  *Id.*  An April 1999 DOC psychological evaluation included notes on his childhood history of psychiatric treatment, suicidal ideation, depression, and auditory hallucinations, along with a three-week hospitalization in 1988-89 that resulted from his lying down on subway tracks.  *Id.*  In July 1999, DOC staff noted in their records that Busanet had reported an attempted suicide by hanging while in juvenile detention and by lying down on subway tracks in 1988 or 1989.  *Id.*

In addition to the DOC's awareness of Busanet's extensive history of mental illness, the DOC was also aware that Busanet was actively experiencing symptoms of mental illness and was at serious risk of self-harm or suicide when he entered DOC custody.  *Id.* at ¶ 23.  In April 1999, a DOC psychiatrist diagnosed Busanet with Major Depressive Disorder, Recurrent with Psychotic Features.  *Id.*  Also in April 1999, Busanet received a psychological evaluation, in which the evaluator noted that he was traumatized, depressed, anxious, had "fragile self-esteem," and was "likely experiencing unusual perceptual or sensory events."  *Id.*  The same report included comments noting Busanet's "suicidal thoughts" and indicated that he was "[a]t risk of self-harm" and "need[ed] to be monitored closely."  *Id.*

While in DOC custody, Mr. Busanet attempted suicide three times.  *Id.* at ¶ 87.  One of these attempts was by hanging, and the other two were by overdosing on pills.  *Id.*  Busanet provides details into two of these attempts: one was in 2000 after Busanet's grandmother passed away, and another was in 2009 after another death-sentenced prisoner died by suicide.  *Id.* at ¶¶

88-89.  Busanet alleges that he did not report his suicide attempts to DOC staff because the DOC's treatment of other individuals who attempted suicide led him to fear that they would punish him. *Id.* at ¶ 90.  Busanet further alleges that at least three death-sentenced prisoners in DOC solitary confinement died by suicide between 1983 and 2019, including one in 2008 and one in 2009.  *Id.* at ¶ 77.  According to Busanet, when individuals on death row died by suicide, DOC staff made no attempt to address the impact of those deaths on other individuals on death row.  *Id.* at ¶ 91.

Busanet pleads an array of facts to show that Defendants were aware that he continued to experience worsening symptoms of mental illness throughout his time in solitary confinement.  *Id.* at ¶ 92.  In 2001, DOC staff prescribed him an anti-depressant medication.  *Id.* at ¶ 93.  In 2002, his DOC records noted that he was diagnosed with Major Depressive Disorder, Recurrent.  *Id.* at ¶ 94.  In 2009, Busanet's post-conviction counsel sent a letter to the DOC's Deputy Chief Counsel informing them of Busanet's diagnoses of bipolar disorder and post-traumatic stress disorder and stating that Busanet had sought treatment for the conditions but had been met by unresponsive prison officials.  *Id.* at ¶ 95.  In 2013, Busanet's attorney sent a letter to Mr. Wetzel and the DOC's Deputy Chief Counsel, stating that incidents at Busanet's housing unit had exacerbated his anxiety and negatively affected his mental health.  *Id.* at ¶ 96.

Mr. Busanet alleges that after leaving solitary confinement, he no longer feels suicidal and is working to adjust to spending time around people.  *Id.* at ¶ 97.  He still struggles with mental illness and the impacts of his time in solitary confinement but has experienced significant improvements to his overall mood and ability to interact with others.  *Id.* at ¶ 98.

**B.  Allegations as to the conditions of Busanet's confinement at the DOC**

Although Mr. Busanet is currently incarcerated at State Correctional Institution – Phoenix ("SCI Phoenix") in Collegeville, Pennsylvania, *id.* at ¶ 9, Busanet was incarcerated at State Correctional Institution – Greene ("SCI Greene") during much of the relevant time period

described below. *Id.* at ¶¶ 51-56, 96. As noted previously, Busanet was housed in solitary confinement pursuant to DOC policy requiring that all death-sentenced individuals be automatically placed in permanent solitary with no possibility of release to the general prison population. *Id.* at ¶ 28. The policy did not provide for any individualized assessment of those with death sentences, and all such individuals were subjected to the same solitary confinement conditions, regardless of their having mental illnesses, psychiatric disabilities, or intellectual disabilities. *Id.* at ¶¶ 28-31. There was also no mechanism for Busanet to challenge the prolonged solitary confinement, which Busanet alleges lacked any legitimate penological justification. *Id.* at ¶¶ 32-34. Mr. Busanet alleges that the judicial review process for death sentences makes it common for death-sentenced individuals in the DOC to spend decades in solitary confinement. *Id.* at ¶ 30.

> Mr. Busanet defines solitary confinement as follows:
>
> Solitary confinement, also referred to as restrictive housing, segregation, or isolation, is any type of detention that involves removal from the general prisoner population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; inability to leave the room or cell for the vast majority of the day, typically 22 hours or more; extremely limited or no opportunities for direct and normal social contact with other human beings; and extremely limited or no opportunities for purposeful out-of-cell activity.

*Id.* at ¶ 35. Busanet explains that, during his years in solitary, he was confined alone in a small cell that measured approximately seven by twelve feet. *Id.* at ¶ 36. He ate, slept, used the toilet, and spent almost all his waking hours alone in this cell. *Id.* His cell and cellblock were illuminated at all times, interfering with his ability to sleep. *Id.* at ¶ 37. He did not have access to meaningful social interaction, nor did he have access to human touch outside of incidental contact with correctional staff members. *Id.* at ¶¶ 38-39. Mr. Busanet was only permitted "non-contact" visits with his attorneys, who had to remain on the other side of a physical barrier, and whose hands he

was not allowed to shake.  *Id.* at ¶ 40.  He was disallowed from participating in programming, including group religious activities and educational programming.  *Id.* at ¶¶ 41-42.

Until 2014, Mr. Busanet was only allowed to spend time outdoors for one hour on weekday mornings in a fenced-in enclosure slightly larger than his cell.  *Id.* at ¶¶ 43-44.  Starting in 2014, he was a permitted to be outside for two hours a day on weekdays.  *Id.*  On weekends and holidays, Mr. Busanet was not permitted outside of his cell.  *Id.* at ¶ 45.  Mr. Busanet's depression impacted his ability to take advantage of the weekday out-of-cell time, and he generally only left his cell a few times per week, if that.  *Id.* at ¶ 46.

Throughout his entire stay in solitary confinement, Mr. Busanet never had a confidential session with a mental health professional, except for professionals retained by his counsel to perform evaluations in support of his post-conviction claims.  *Id.* at ¶ 47.  DOC mental health professionals conducted brief, non-confidential check-ins through his cell door.  These check-ins typically consisted solely of DOC staff asking Busanet how he was doing.  *Id.* at ¶ 48.

Mr. Busanet alleges that he remained in solitary confinement until at least December 2019. *Id.* at ¶ 49.  At that time, the DOC implemented a new policy for death-sentenced individuals per a settlement agreement in *Reid v. Wetzel*, 1:18-cv-00176 (M.D. Pa.).  *Id.*  Mr. Busanet acknowledges that between the spring of 2018 and December 2019, some changes were made to the conditions of the CCU, but that he still experienced many of the same deprivations as before, including a lack of meaningful social interaction, human touch, physical exercise, and the opportunity to participate in group activities, and that he still had to spend the vast majority of his days and nights alone in his cell.  *Id.* at ¶ 51.  The positive changes during that time included the addition of outdoor time on weekends, the offering of one hour per day of dayroom time with other individuals serving a death sentence, and the potential to eat meals out of cell with others in the

CCU.  *Id.* at ¶ 52.  Mr. Busanet alleges that these positive changes were inconsistently implemented during that time.  *Id.* at ¶ 53.  Mr. Busanet also alleges that he and others were not given preparation for these changes or provided orientation to returning to life around people, and that they were therefore unable to meaningfully participate in the out-of-cell time with others.  *Id.* at ¶¶ 54-55. Until January 2022, Busanet and other death-sentenced prisoners remained segregated from the general prison population and were denied the opportunity to participate in programming.[3]  *Id.* at ¶ 50.

### C.  Allegations as to the Defendants' knowledge of the negative impacts of solitary confinement

Mr. Busanet refers to medical and psychological literature showing that prolonged solitary confinement causes serious physical and physiological harm.  *Id.* at ¶ 57.  According to various researchers, these negative impacts include:

1.  People in solitary confinement are deprived of the fundamental human needs of meaningful social contact and caring human touch.  *Id.* at ¶ 58.

2.  Solitary confinement causes an increased risk of decompensating and of experiencing psychotic episodes, including audio and visual hallucinations.  *Id.* at ¶ 59.

3.  Solitary confinement has been shown to cause and exacerbate mental illness such as depression and anxiety, along with severe mental deterioration and decreased cognitive functioning.  *Id.* at ¶ 60.

---

[3] Defendants submit evidence contesting Busanet's account of the conditions of confinement at SCI Greene, to which Busanet responds with further evidence to support his account.  Because I review his claims under a motion to dismiss standard, I will not consider this evidence at this time and do not recount it in detail here.

4.  Solitary confinement often causes extreme feeling of hopelessness, despair, rage, and anger, along with paranoia, distrust of other people, and the loss of the ability to interact with other people.  *Id.* at ¶ 61.

5.  Solitary confinement increases the risk of suicide and attempted suicide.  *Id.* at ¶ 62.

6.  Solitary confinement has been linked to skin conditions such as rashes and dry, flaky skin; Vitamin D deficiency due to lack of natural light; and hypertension, among other physical impacts.  *Id.* at ¶ 63.

7.  Solitary confinement can worsen musculoskeletal pain, cause fluctuations in body weight, and result in the loss of muscle mass.  *Id.* at ¶ 64.

8.  Solitary confinement commonly causes chronic sleep disturbance and the adverse health impacts associated with it.  *Id.* at ¶ 65.

Mr. Busanet alleges that these impacts are all intensified for people who, like him, suffer from preexisting, serious mental illness.  *Id.* at ¶ 66.

In addition to the impacts shown in medical and psychological literature, Busanet points to various instances of official recognition of the negative impacts of solitary confinement, alleging that courts, non-governmental organizations, legislatures, voters, and prison officials have all expressed concern about the ways solitary confinement harms individuals and society.[4]  *Id.* at ¶ 67. Busanet refers to a U.S. Department of Justice ("DOJ") investigation into the DOC's use of solitary confinement for prisoners with serious mental illnesses and/or intellectual disabilities, which noted that 70% of suicide attempts in the DOC between January 1, 2012 and May 31, 2013 occurred in solitary confinement units.  *Id.* at ¶¶ 73-74.  Busanet alleges that throughout this investigation,

---

[4] Busanet cites several judicial opinions and other official sources to support this allegation.  To the extent that they are relevant, I review those sources in the analysis section below, rather than as part of Busanet's factual allegations.

Secretary Wetzel and other DOC officials expressed an understanding of the serious harm that solitary confinement causes. *Id.* at ¶ 75. Busanet also alleges that the DOC made changes to the conditions of confinement for individuals with serious mental illness and intellectual disabilities in 2015 as part of a settlement agreement, but that these changes were not implemented for individuals serving a death sentence. *Id.* at ¶ 76. Finally, Mr. Busanet points to a February 2017 letter sent by attorneys from the American Civil Liberties Union and other civil rights firms urging Wetzel to end the DOC's policy of automatically placing individuals serving a death sentence in permanent solitary confinement. *Id.* at ¶ 80. The letter summarized the harms of solitary confinement and cited examples of states that had eliminated similar policies. *Id.* at ¶ 81. Wetzel and the DOC's Chief Counsel sent a response stating that they would maintain the policy. *Id.* at ¶ 82.

## II.  Standard of Review

Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III.  Discussion

### A.  Busanet's claims are not untimely on the face on his complaint.

Although this Circuit allows a statute of limitations defense to be raised in a Rule 12(b) motion, a plaintiff's claims cannot be dismissed under 12(b) for untimeliness unless the statutory bar is "apparent on the face of the complaint." *Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 604 (3d Cir. 2017) (quoting *Schmidt v. Sklolas*, 770 F.3d 241, 249 (3d Cir. 2014)). Here, untimeliness is not so apparent.

Mr. Busanet's claims are subject to a two-year statute of limitations. *Urritia v. Harrisburg Cnty. Police Dep't*, 91 F.3d 451, 457 n.9 (3d Cir. 1996) (applying the Pennsylvania personal injury

statute of limitations for two years to a § 1983 action); *Disabled in Action of Pa. v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008) (applying the Pennsylvania personal injury statute of limitations for two years to ADA and Rehabilitation Act claims). The continuing violations doctrine, however, tolls the statute of limitations such that a federal action is timely "so long as the last act evidencing the continuing practice falls within the limitation period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (citations omitted); *see Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998). Busanet pleads that Defendants continued violating his statutory and constitutional rights until December 2019. Taking his allegations as true, I find that his claims filed in September 2021 are timely. I will therefore not grant the motion to dismiss on this basis.

Defendants alternatively suggest that I treat their motion as one for summary judgment and consider the exhibits they presented regarding when the CCU became a less restrictive unit. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360-61 (3d Cir. 2016). But if the nonmovant, in response to such a motion, shows by affidavit that "it cannot present facts essential to justify its opposition" at that time, the court can (1) defer considering the motion or deny it, (2) allow time to take discovery, or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d).

Here, Plaintiff has included an affidavit than presents issues of fact. Separately he has identified relevant discovery that will provide a fuller understanding of the record as to timeliness. Pl.'s Ex. B, ECF 30-3; *see Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015). Moreover, where determinations of fact surrounding the timing of the alleged violations are inextricably linked to the merits of a claim, as they are in this case, the best course is to let discovery proceed generally.

I therefore decline Defendants' request to treat their motion to dismiss for lack of timeliness as a motion for summary judgment, and grant Plaintiff additional discovery on the limitations issue. *See Shelton*, 775 F.3d at 568 (explaining that district courts typically allow requests for further discovery "as a matter of course") (citations omitted).

**B.   Busanet's procedural due process claim fails because Defendant Wetzel is entitled to qualified immunity.**

Mr.  Wetzel moves to dismiss Mr. Busanet's claim under the Fourteenth Amendment.  In this claim, Mr. Busanet asserts that Secretary Wetzel violated his rights under the Fourteenth Amendment's Due Process Clause by failing to provide him with individualized review of his placement in solitary confinement or any meaningful opportunity to challenge his continued placement therein.

The Due Process Clause of the Fourteenth Amendment imposes procedural restraints before a state actor can deprive individuals of "liberty" and "property" interests.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).   To assess procedural due process claims, courts analyze (1) whether the state has interfered with a protected liberty or property interest and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Here, Mr. Busanet sets forth sufficient facts to allege a due process violation, as he demonstrates that his placement in solitary confinement implicated a constitutionally-protected liberty interest, and alleges that he was given no procedural protections before and during his placement in solitary confinement.  But because this right to procedural due process was not clearly established at the time of the harm, I am constrained to find that Wetzel is entitled to qualified immunity on this claim.

> 1. *Busanet was deprived of a constitutionally protected liberty interest because he faced an atypical and significant hardship relative to the ordinary incidents of prison life.*

To determine whether restrictive conditions of confinement create a constitutionally protected liberty interest, courts consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall impose[] a significant hardship in relation to the ordinary incidents of prison life." *Williams v. Pa. Dep't of Corr.*, 848 F.3d 549, 559-60 (3d Cir. 2017) (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)). Whether a protected liberty interest exists is a "fact-specific" inquiry. *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003).

Mr. Busanet's Amended Complaint alleges that he was placed in atypically harsh, unconstitutional conditions of confinement for a substantial period of time, as he asserts that his placement in solitary lasted for approximately twenty years. Am. Comp. ¶ 27; *see Williams*, 848 F.3d at 561 (finding that six years and eight years in solitary confinement marshalled in favor of finding an atypical hardship). The parties strongly dispute, however, whether Busanet's conditions of confinement imposed a significant hardship relative to the "ordinary incidents" of prison life.

The parties' dispute primarily involves the correct benchmark against which to assess Mr. Busanet's conditions of confinement. Mr. Busanet argues that *general population* conditions are the proper comparator here. To bolster his argument, he points to the Third Circuit's ruling in *Williams*, in which the Circuit held that the death row confinement faced by that plaintiff should be compared to the conditions in the general prison population – even though this holding rested largely upon the fact that Williams' death sentence had been vacated. *See* 848 F.3d at 562-66. But, because of this distinction, Wetzel argues that the most relevant analysis on this issue comes from a Fourth Circuit case that held that *death row* conditions are the appropriate comparator for the liberty interest analysis for individuals with active death sentences. *See Prieto v. Clarke*, 780 F.3d 245, 253-54 (4th Cir. 2015).

Although this case is slightly different from *Williams* because Mr. Busanet remains subject to a death sentence, I nonetheless find it applicable, with the result that general population conditions represent the proper comparator.  Admittedly, part of the Third Circuit's reasoning in *Williams* certainly focused on the fact that the plaintiffs in that case no longer had active death sentences.  *See* 848 F.3d at 564-65.  But in specifically discussing the proper metric, *Williams* seems to make clear that the general population should *always* be the starting point in this analysis within the Third Circuit, even beyond the unique factual circumstances of that case.  The panel noted that past Third Circuit precedent established that the terms "ordinary" and "routine" direct courts to "use a general metric (the general population)," rather than a metric specific to a particular plaintiff.  *Id.* at 564 (quoting *Shoats*, 213 F.3d at 144) (cleaned up).  And the Circuit repeatedly emphasized that "[i]t is the conditions themselves that determine whether a liberty interest is implicated," regardless of what DOC regulations require or the reasoning behind an individual's placement in solitary confinement.  *See Williams*, 848 F.3d at 564-66.  The Fourth Circuit case cited by the defense, *Prieto*, stands in contradiction with the Third Circuit on this point, stating that prison conditions cannot give rise to a liberty interest "simply by virtue of their severity."  780 F.3d at 250.  Necessarily, Third Circuit precedent controls, and I conclude that general population conditions provide the proper comparator for purposes of Mr. Busanet's claim.

Using the general population as a comparator, I consider the solitary confinement conditions faced by Mr. Busanet to constitute an atypical and significant hardship relative to the ordinary incidents of prison life.  *See* Am. Compl. at ¶¶ 35-48, 51; *see also Williams*, 848 F.3d at 563 (listing litany of ways that life on death row differs from life in the general population in DOC facilities).  Beyond the general hardships faced by those in solitary confinement, Busanet further pleads that his placement in solitary exacerbated his pre-existing mental health issues, leading to

an increase in suicidality and other symptoms that may have been mitigated if the DOC had placed

him in less isolated confinement conditions with easier access to psychological care. *See* Am.

Compl. at ¶¶ 27-47, 83-87; *see also Williams*, 848 F.3d at 569 (stating that indefinitely subjecting

individuals "to isolating conditions that researchers agree cause deep and long-term psychic harm

. . . is the essence of the atypical and significant hardship inquiry"). Mr. Busanet has therefore

sufficiently pled that he was subjected to atypical, significant hardship during his twenty years in

solitary confinement on death row.

> **2.** *Busanet pleads sufficient facts to show that he was given no procedural protections before he was deprived of his liberty interest.*

The Complaint pleads facts to satisfy the second prong of the procedural due process

analysis, as he asserts that there were *no* procedural protections whatsoever to protect his liberty

interest. Specifically, Mr. Busanet states that he "was placed in solitary confinement pursuant to

a DOC policy under which all death-sentenced prisoners were automatically placed in permanent

solitary confinement, with no individualized assessment nor possibility of release to the general

prison population." Am. Compl. at ¶ 28. He further asserts that DOC made *no* individual

evaluations of death-sentenced individuals' psychiatric disabilities before placing them in solitary

confinement on death row and offered *no* review process for such individuals to be released from

prolonged solitary confinement. *See id.* at ¶¶ 31-33. Given the atypical hardship which Mr.

Busanet was subjected to, he would have at the very least been entitled to *some* process to

meaningfully challenge his continued placement in solitary confinement. *See Stuart v. Pierce*, 587

F. Supp. 3d 127, 139 (D. Del. 2022) (Restrepo, J., sitting by designation) (finding that plaintiff

with pre-existing mental health issues was entitled to some amount of process prior to continued

detention in solitary confinement). The facts pled in the Amended Complaint state that he did not

receive any such process, and as such, Mr. Busanet has sufficiently pled the elements of a

Fourteenth Amendment procedural due process claim.

> ### 3. Defendant Wetzel is entitled to qualified immunity because Busanet's procedural due process right was not clearly established.

"The doctrine of qualified immunity shields officials from civil liability if their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citation omitted).

Here, because Mr. Busanet's procedural due process rights were not clearly established at the time

of his alleged injury, Defendant Wetzel is entitled to qualified immunity.

To determine whether a right was "clearly established" for qualified immunity purposes, a

court must first define the right allegedly violated. *Id.* (citing *Sharp v. Johnson,* 669 F.3d 144, 159

(3d Cir. 2012)). The court must then assess whether that right was sufficiently clear to a reasonable

official at the time of the violation, based on existing precedent. *See id.* In determining whether

the right was clearly established, the right must generally be delineated in Supreme Court

precedent, binding opinions of the Third Circuit, or a "robust consensus" of authority from other

Courts of Appeals – though courts "may also take into account district court cases, from within

the Third Circuit or elsewhere." *Id*. at 165-66 (citations omitted).

Here, the violated right is defined as the right of an incarcerated individual with pre-

existing mental illness to avoid prolonged solitary confinement without procedural due process

protections, regardless of their sentencing status. Mr. Busanet claims that this right was clearly

established under *Williams*, arguing that the *Williams* opinion "clearly established that incarcerated

individuals have a protected liberty interest in avoiding prolonged solitary confinement." Pl.'s

Opp. at 23-24, ECF 30.

But this takes *Williams* too far.  Although the language of the opinion certainly *suggests* that such a broad right exists, the specific right clearly established by that opinion was narrower, with the Circuit holding that the *Williams* plaintiffs "had a due process liberty interest in avoiding the extreme sensory deprivation and isolation endemic in confinement on death row *after their death sentences had been vacated.*"  *Williams*, 848 F.3d at 570 (emphasis added).  Indeed, the *Williams* opinion explicitly declined to rule on the circumstances faced by incarcerated individuals like Mr. Busanet "whose death sentences are still active and viable."  *Id.* at 553 n.2.  And the Third Circuit itself has endorsed such a limited reading.  *See Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 438 n.2 (3d Cir. 2020) ("In *Williams*, we did not decide whether inmates who have not been granted resentencing hearings and vacatur have a procedural due process interest in avoiding continued solitary confinement.").  Because Mr. Busanet's right to procedural due process protections was not clearly established in Third Circuit precedent – let alone Supreme Court precedent – Defendants are entitled to qualified immunity.  *See Lopez v. Wetzel*, No. 3:21-CV-1819, 2022 WL 17340629, at *7 (M.D. Pa. Nov. 30, 2022) (Conner, J.) (reaching same conclusion).

Alternatively, Mr. Busanet argues that because prolonged solitary confinement of someone with mental illness clearly violates the Eighth Amendment, Wetzel should have been on notice that such confinement triggers due process protections as well.  *See Gillis v. Litscher*, 468 F.3d 488, 493-95 (7th Cir. 2006) (noting the "inevitable conclusion" that conditions violating the Eighth Amendment may also constitute an atypical and significant hardship under the Fourteenth Amendment, such that an incarcerated individual has a constitutionally protected liberty interest).  This is a creative argument, and while it bolsters the proposition that Mr. Busanet's due process rights were violated, it is insufficient to create a clearly established right.  *See Peroza-Benitez*, 994

18

F.3d at 165 (noting that a right must be "sufficiently clear," such that an official understands that she is violating a specific right).

I therefore find that Defendant Wetzel is entitled to qualified immunity on Mr. Busanet's Fourteenth Amendment claim, and this claim must be dismissed.

**C. Defendants are not entitled to qualified immunity for Busanet's Eighth Amendment claim.**

Having concluded that Mr. Busanet's procedural due process claim fails because of qualified immunity, I now consider whether the same is true of Busanet's Eighth Amendment claim. Busanet alleges that Secretary Wetzel violated Busanet's right to be free from cruel and unusual punishment by subjecting him to conditions of confinement that deprived him of life's basic necessities, and that Wetzel did so with deliberate indifference to his ongoing suffering and the substantial risks of serious physical and psychological harm. Specifically, Busanet claims that Wetzel violated the Eighth Amendment right of an incarcerated person with a known history of mental illness and suicidality to not be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history and the elevated risks that solitary confinement posed to him.

> *1. Busanet pleads that Wetzel violated a right that was clearly established, so qualified immunity does not apply from 2014 onwards.*

As reviewed above, qualified immunity protects officials from civil liability if their conduct does not violate clearly established rights of which a reasonable person would have known. Busanet alleges that, at least beginning when Wetzel was appointed Secretary of the DOC in 2011, an individual with a known history of mental illness and suicidality had a clearly established right not to be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history and the exacerbated risks that solitary confinement posed to him. Wetzel argues that qualified immunity applies because the relevant right was not clearly established when Busanet

was in solitary confinement.  I conclude that Defendant is partially correct, but that Wetzel should have known of the clearly-established right at issue as of his receipt of a February 24, 2014 DOJ findings letter regarding DOC solitary confinement conditions.

Busanet and Defendants both leverage Third Circuit case law in their arguments. Defendants rely chiefly on *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020), whereas Busanet relies on *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), and *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022).

In *Palakovic*, the plaintiff claimed that Secretary Wetzel and the DOC "were deliberately indifferent by placing [him] in solitary confinement, given his mental health vulnerabilities, which deprived him of basic human needs of environmental stimulation, social interaction, mental health, and physical health."  854 F.3d at 224.  In support of this claim, Palakovic "alleged that the prison diagnosed [him] with an array of serious mental health issues and placed him on a mental health roster, making it quite reasonable to infer that prison officials had (or should have had) knowledge of those diagnoses."  *Id*. at 226.  Palakovic further alleged that Wetzel and his subordinates were aware of the potential negative impacts of solitary confinement conditions.  *Id*.  "Considering these factual allegations in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health," the Third Circuit held that Palakovic had sufficiently stated a claim that he "experienced inhumane conditions of confinement to which the prison officials . . . were deliberately indifferent."  *Id*.  The Court did not address the issue of qualified immunity.

Following *Palakovic*, the plaintiff in *Porter* claimed that the DOC's placing of him in solitary confinement for thirty-three years violated his right to be free from cruel and unusual punishment.  *Porter*, 974 F.3d at 435.  Unlike Palakovic, the plaintiff in *Porter* did not enter

solitary confinement with a known history of mental illness, but his time in solitary still caused him to experience severe anxiety, depression, panic, paranoia, bipolar mood swings, and suicidal impulses.  *Id*. at 443.  Also unlike Palakovic, Porter was housed in the Capital Case Unit.  *Id*. at 435.  The Court held that, at the time Porter was in the CCU, an individual on death row without a known history of mental illness did not have a clearly established right to be free from the serious detrimental health impacts caused by prolonged solitary confinement, but that going forward, such a right was clearly established, "particularly where . . . Defendants have failed to provide any meaningful penological justification."  *Id*. at 450-51.  In the Third Circuit, Porter argued that *Palakovic* warranted a different result, but the Court disagreed on the basis that Palakovic "was not on death row and had specific known mental health issues pre-assignment to solitary confinement."  *Id*. at 450.

Then, in *Clark v. Coupe*, the Third Circuit addressed whether qualified immunity applied when the plaintiff alleged that "his prolonged stay in solitary confinement, imposed by prison officials who knew he was mentally ill, caused him to suffer mental deterioration for no justifiable reason in violation of his Eighth Amendment rights."  55 F.4th at 178.  Drawing heavily on *Palakovic*, the Court began its analysis by noting that Clark had successfully stated an Eighth Amendment deliberate indifference claim, because he alleged that the DOC defendants were aware that he was seriously mentally ill and had known that placing him in solitary confinement would cause him to be severely and adversely affected.  *Id*. at 180-81.  The Court defined this right as "the right of a prisoner known to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions."  *Id*. at 182.

The Court then assessed whether the right was clearly established at the time of the events at issue: 2016. "In determining whether [the] articulated right was clearly established at the time of Clark's seven-month stay in [solitary confinement]," the Court "broaden[ed] the scope beyond determining whether 'the very action in question has been held unlawful'" and considered whether other cases had provided state officials with "fair warning that their conduct is violative even in 'novel factual circumstances' never previously addressed in caselaw." *Id*. Using this framework, the Circuit held that "the circumstances of [Clark's] time spent in solitary confinement violated rights long protected by Eighth Amendment jurisprudence," rendering qualified immunity inapplicable. *Id*. at 181.

The *Clark* Court relied on several Third Circuit and Supreme Court opinions in reaching this determination. The Court began by referring to *Young v. Quinlan*, 960 F.2d 351, 359-64 (3d Cir. 1992), in which the Third Circuit held that prison conditions "may not be so brutal or unhealthy as to be in itself a punishment" and explained that, when assessing the conditions of segregated housing units, "[t]he touchstone is the health of the inmate." *Clark*, 55 F.4th at 183. It construed *Young* as having held that although solitary confinement is not per se unconstitutional, its use can be if the conditions of confinement are "foul, inhuman or totally without penological justification." *Id*. *Clark* then cited *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), for the proposition that "the 'wanton and unnecessary infliction of pain' had long violated the Eighth Amendment prohibitions against cruel and unusual punishment." *Clark*, 55 F.4th at 183. And the Court cited *Farmer v. Brennan*, 511 U.S. 825, 843-45 (1994), for the proposition that "[l]ong before [plaintiff's] stay in the [solitary housing unit], Eighth Amendment law prohibited officials from recklessly imposing conditions carrying a known risk to a prisoner's health for no justifiable reason." *Clark*, 55 F.4th at 184.

Next, *Clark* acknowledged that the Third Circuit had "long held that allegations of inflicting a serious mental injury are sufficient to state a claim under the Eighth Amendment." *Id.* at 184 (citing *White v. Napoleon*, 897 F.2d 103, 110-11 (3d Cir. 1990)).  It also found a "general consensus among the Courts of Appeals . . . that a threat of serious psychological injury invokes Eighth Amendment protection." *Id*. at 184-85 (citing *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994); *Jordan v. Gardner*, 986 F.2d 1521, 1529 (9th Cir. 1993) (en banc); *Scher v. Engelke*, 943 F.2d 921, 924 (8th Cir. 1991)).  Finally, the Court noted that the Supreme Court had recognized that solitary confinement posed a threat to prisoners' mental health over a century ago. *Id.* at 184 (citing *In re Medley*, 134 U.S. 160, 168 (1890)).  The *Clark* Court relied on these varied authorities as supporting the conclusion that the right at issue was clearly established at the time Clark entered solitary confinement in 2016.

Having reviewed the relevant case law, the controlling question here is whether the Eighth Amendment right identified and defined in *Clark* also extends to individuals on death row.  I conclude that it does. *Porter* distinguished *Palakovic* on the grounds that Palakovic, unlike Porter, was "not on death row and had specific known mental health issues pre-assignment to solitary confinement."  974 F.3d at 450.  But this distinction in *Porter* can hardly be read to suggest that Eighth Amendment protections do not extend to someone awaiting execution. And in a more pointed summary of *Palakovic*, the *Porter* Court did not highlight the plaintiff's sentence, stating only that "[c]onsidering the plaintiff's particular vulnerability in light of the known dangers of solitary confinement, we held that the plaintiff had stated an Eighth Amendment claim." *Id.*  Well before *Palakovic* and *Porter*, the Third Circuit explained that, when determining whether segregated detention is cruel and unusual punishment, "[t]he touchstone is the health of the inmate." *Young*, 960 F.2d at 364.  And as far back as the late 19th century, the Supreme Court

recognized that solitary confinement was a severe and additional punishment even for those who had been sentenced to death. *In re Medley*, 134 U.S. 160, 167-73 (1890).

*Medley* arose out of a petition for a writ of habeas corpus. The petitioner was convicted of murder and then sentenced to death under a statute passed after the crime was committed, leading him to challenge various aspects of the sentence as *ex post facto*. *Id.* at 161-66. One provision of the new statute required prisoners awaiting execution to be held in solitary confinement, and this became the focus of the Court's analysis. *Id.* at 167. It first defined the controlling standard, stating that "it may be said that any law which was passed after the commission of the offense for which the party is being tried is an *ex post facto* law when it inflicts a greater punishment than the law annexed to the crime at the time it was committed." *Id.* at 171. It then considered the history of solitary confinement both as a penal practice and as a criminal sanction, concluding that it imposed "an immense mental anxiety amounting to a great increase of the offender's punishment," which could not be imposed retroactively. *Id.* at 172.

From this case law, I conclude that the relevant inquiries are the conditions of confinement imposed upon the individual, that individual's personal mental health history, the ongoing impacts of their confinement, and the awareness of prison officials of that personal history and the potential health impacts arising from the conditions of confinement. The specific sentence that the individual is serving does not play a role in the Eighth Amendment inquiry, and the Commonwealth places far too much emphasis on the distinction drawn by *Porter*. I therefore hold that individuals with a known history of mental illness and suicidality have a clearly established right not to be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history and the risks that solitary confinement posed to him, regardless of whether that person is serving a death sentence.

The recent decision in *Williams v. Wetzel* is not to the contrary. No. CV 21-1248, 2022 WL 2869316 (E.D. Pa. July 21, 2022).  The plaintiff in *Williams* also contended that his placement in solitary confinement on death row violated the Eighth Amendment.  Like Mr. Busanet, the plaintiff in *Williams* had a history of mental illness that was exacerbated by his time spent in solitary, but *Williams* turned on the fact that the DOC did not know of that history.  The record was "not clear" whether Williams' doctors provided copies of their declarations about Williams' history of mental illness to DOC staff, and DOC staff never diagnosed Williams with a mental illness or impairment despite conducting a psychological evaluation and regular visits.  *Id.* at *2.  Williams engaged in what appeared to be a suicide attempt while in DOC custody, but DOC mental health professionals accepted his explanation that the attempt was faked so that he could leave his cell, and DOC staff deemed him "not depressed."  *Id.*  As to the Eighth Amendment right recognized by the *Clark* Court, the key inquiry is whether the individual in solitary is "known to be seriously mentally ill" and whether prison officials were "aware of, but disregarded the risk of lasting harm posed by such conditions."  *Clark*, 55 F.4th at 182.  Because the DOC staff in *Williams* did not know the plaintiff to be seriously mentally ill, *Williams* is not analogous to the fact pattern presently before me.

Having concluded that there is a clearly established right at least as of the Third Circuit's decision in *Clark*, I must determine when it was that "every reasonable official would have understood that what he [was] doing violate[d] that right."[5]  *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016) (internal quotations omitted).  After review of the relevant authorities, I conclude that the right was clearly established as of Secretary Wetzel's receipt of the DOJ findings letter in 2014.

---

[5] Busanet argues that it was clearly established as far back as 2011, when Wetzel became Secretary of the DOC.

Beginning with the cases I have already discussed, *Palakovic* did not concern qualified immunity, so the Third Circuit did not need to determine whether the Eighth Amendment right was clearly established during Palakovic's entire stay in solitary confinement, which began in 2011.   *Clark* concerned events that took place in 2016, and the Court held that the Eighth Amendment right was clearly established at that time.  55 F.4th at 173, 188.  The *Clark* Court did not decide whether the same right was clearly established *before* 2016, but the opinions on which it relied were published in the 1990s or earlier.   Several of these authorities stand for the proposition that the Eighth Amendment is violated by conditions of confinement that are overly harsh and violate the health and well-being of an incarcerated individual without legitimate justification.  *See Young*, 960 F.2d at 359-64; *Rhodes*, 452 U.S. at 347; *Farmer*, 511 U.S. at 843-45.  Others stand for the proposition that injuries to mental well-being are sufficient to constitute an Eighth Amendment violation.  *See White*, 897 F.2d at 110-11; *Shakka*, 71 F.3d at 166; *Thomas*, 31 F.3d at 559; *Jordan*, 986 F.2d at 1529; *Scher*, 943 F.2d at 924.  All of these cases – which formed the basis for *Clark* – extend back well before 2016.

A 2014 DOJ findings letter specifically informed Wetzel that DOC's use of solitary confinement on individuals with severe mental illness violated the Eighth Amendment.  Findings Letter re: Investigation of the Pa. Dep't of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities at 6-14 (Feb. 24, 2014), https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf ("Findings Letter").  The letter informed Wetzel that the manner in which the DOC used solitary confinement on individuals with serious mental illness was unjustifiably harsh and caused serious psychological and physiological harms for those individuals.  *Id.* at 2-3.  The findings letter also included case studies and citations to case law to support its conclusion that DOC's use of solitary

confinement on individuals with severe mental illness violated their Eighth Amendment rights. *Id.* at 6-14.  Busanet further alleges that throughout the investigation that led to this findings letter, Wetzel and other DOC officials expressed an understanding of the serious harm caused by solitary confinement.  Am. Compl. at ¶ 75.

In *Hope v. Pelzer*, the Supreme Court referred to a similar DOJ letter as relevant to the existence of qualified immunity in a case challenging the practices of the Alabama Department of Corrections.  536 U.S. 730, 744-45 (2002).  The Court stated that "[a]lthough there [was] nothing in the record indicating that the DOJ's views were communicated to respondents," the DOJ's findings that DOC had imposed improper punishment without penological justification "lend[ed] support to the view that reasonable officials in the [DOC] should have realized that [the practice at issue] violated the Eighth Amendment prohibition against cruel and unusual punishment." *Id.* at 745.

The DOJ findings letter here indicates that it was sent directly to Defendant Wetzel. Findings Letter at 25.  And the letter drew on extensive case law to support its claim that DOC's use of solitary confinement on prisoners with severe mental illness violates their Eighth Amendment rights. *Id.* at 7-8.  The letter cited *Farmer*, 511 U.S. at 828, and *Young*, 960 F.2d at 364, both discussed above.  It cited the Court's holding in *Hope* that prison officials show deliberate indifference when they disregard obvious risks to prisoner safety.  536 U.S. at 738-45. It cited *Wilson v. Seiter*, 510 U.S. 294, 304 (1991), in which the Court held that conditions of confinement violate the Eighth Amendment when they combine "to have a mutually enforcing effect that produces the deprivation of a single, identifiable human need."  And it cited several District Court cases to support its conclusion that DOC was violating prisoners' Eighth Amendment rights. *See United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("It is

well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee."); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995) (stating that long periods of isolation for those with severe mental illnesses can be "the mental equivalent of putting an asthmatic in a place with little air to breathe"); *Morris v. Travisono*, 499 F. Supp. 149, 160 (D.R.I. 1980) ("Even if a person is confined to an air conditioned suite at the Waldorf Astoria, denial of meaningful human contact for . . . an extended period of time may very well cause severe psychological injury.").

Following his receipt of this letter, I am convinced that a reasonable official in Secretary Wetzel's position would have been aware that a prisoner known to be seriously mentally ill had a clearly established right to not be placed in solitary confinement for an extended period of time by prison officials who knowingly disregarded the risk of lasting harm posed by such conditions. I therefore conclude that qualified immunity does not apply following Wetzel's receipt of the February 24, 2014 letter.

> 2. *Because a defendant cannot have qualified immunity if he was deliberately indifferent, qualified immunity does not preclude Busanet's Eighth Amendment claim on a motion to dismiss.*

My conclusion as to when the relevant right became clearly established is not the end of the inquiry, however, because there is an alternate theory to consider. Mr. Busanet also argues that qualified immunity does not apply because a defendant cannot have qualified immunity if he was deliberately indifferent. Wetzel has not responded to this argument.

Two Third Circuit cases provide direct support for Busanet's argument. In *Carter v. City of Philadelphia*, the Third Circuit explained that "[q]ualified immunity protects official action if the officer's behavior was objectively reasonable in light of the constitutional rights affected," and that a plaintiff "succeed[ing] in establishing that the . . . defendants acted with deliberate

indifference to constitutional rights . . . [proves that] a fortiori their conduct was not objectively reasonable." 181 F.3d 339, 356 (3d Cir. 1999) (internal quotations omitted). The Third Circuit expanded on this reasoning in *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Citing its opinion in *Carter*, the Third Circuit stated that "[b]ecause deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent," because "a reasonable [defendant] could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiffs and failing to adequately respond to that risk." *Id.* The *Beers-Capitol* court further explained that "[c]onduct that is deliberately indifferent to an excessive risk to [plaintiffs] cannot be objectively reasonable conduct."[6] *Id.* Separately, therefore, Secretary Wetzel cannot maintain a qualified immunity defense if he was deliberately indifferent to Busanet's ongoing suffering and the substantial risks of serious physical and psychological harm he faced as a result of his time in solitary confinement with pre-existing mental illness.

The question then becomes whether Busanet has successfully pled deliberate indifference such that a qualified immunity defense is precluded. In *Farmer v. Brennan*, the Supreme Court provided the test for holding prison officials liable for deliberate indifference:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

---

[6] District Courts across this Circuit have reiterated the same principle. *See, e.g.*, *Gioffre v. County of Bucks*, No. 08-cv-4232, 2009 WL 3617742, at *6 (E.D. Pa. Nov. 2, 2009); *Reagan v. Meisel*, No. 99-cv-5748, 2004 WL 3019317, at *3 n.3 (E.D. Pa. Dec. 28, 2004); *Thomas v. Harrisburg City Police Dep't*, No. 1:20-CV-01178, 2021 WL 4819312, at *9 (M.D. Pa. Oct. 15, 2021); *Hollihan v. Pa. Dep't of Corr.,* 159 F. Supp. 3d 502, 513 (M.D. Pa. 2016); *Miller v. Bedford County,* No. 3:18-CV-10, 2022 WL 969963, at *8 (W.D. Pa. Mar. 31, 2022).

511 U.S. 825, 837 (1994).  It should be noted that Defendant has not challenged whether Busanet has adequately pleaded deliberate indifference, and after reviewing the Amended Complaint drafted by counsel, I conclude that the facts as pleaded plausibly support a deliberate indifference claim dating back to Mr. Wetzel's appointment as Secretary of the DOC in 2011.[7]

Taking Mr. Busanet's allegations as true, there is no question that Wetzel was aware of Busanet's history of mental illness.  Busanet alleges that Wetzel became personally familiar with his history of mental illness while serving as his counselor in the Berks County Jail.  Am. Compl. at ¶ 24.  As far back as 1999, DOC staff noted Busanet's "suicidal thoughts" and indicated that he was "[a]t risk of self-harm" and "need[ed] to be monitored closely."  *Id.* at ¶ 23.  DOC notes also indicated that he was traumatized, depressed, anxious, had "fragile self-esteem," and was "likely experiencing unusual perceptual or sensory events."  *Id*.  DOC staff prescribed Busanet anti-depressant medication and diagnosed him with Major Depressive Disorder, *id.* at ¶¶ 93-94; the DOC Deputy Chief Counsel received a letter in 2009 informing them of Busanet's diagnoses of bipolar disorder and post-traumatic stress disorder, *id.* at ¶ 95; and Wetzel himself received a letter in 2013 stating that incidents at Busanet's housing unit had exacerbated his anxiety and negatively affected his mental health, *id.* at ¶ 96.  Busanet has clearly established Wetzel's knowledge of Busanet's mental illness history.

Moreover, Mr. Busanet alleges sufficient facts to suggest that Secretary Wetzel knew of the risk of solitary confinement on individuals like Busanet.[8]  Busanet alleges that "DOC officials,

---

[7] Because the test for deliberate indifference focuses on a defendant's knowledge of actual risk, rather than a defendant's awareness of clearly established law, the deliberate indifference analysis differs from the qualified immunity analysis discussed above.

[8] In addition to these factual allegations, Busanet cites Supreme Court case law showing that the negative impacts of solitary confinement were understood as early as the late 19th century.  *In re Medley*, 134 U.S. at 167-69.

including Defendant Wetzel, have been aware of the psychological and physical dangers of solitary confinement and prolonged isolation, in general, as well as the even greater risk these conditions pose for people with serious mental illness, for many years." *Id.* at ¶ 72.  Busanet points to medical and psychological literature that supports this fact.  *Id.* at ¶ 57.  Busanet also points to a disproportionate percentage of suicide attempts that occurred in DOC solitary confinement, as well as three deaths by suicide in such conditions. *Id.* at ¶¶ 74, 77.  Finally, Busanet alleges that Wetzel and other DOC officials expressed an understanding of the serious harm caused by solitary confinement throughout the investigation that led to the 2014 DOJ findings letter.  *Id.* at ¶ 75.  Interpreting these allegations in the light most favorable to Busanet, as is required when reviewing a motion to dismiss, I conclude that Busanet has pled that Wetzel was aware of an excessive risk to health or safety arising from DOC's use of solitary confinement on individuals with severe mental illness throughout his time as Secretary of the DOC.  *See Farmer*, 511 U.S. at 842-43 ("If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (cleaned up).  Defendants' decision not to move to dismiss Busanet's deliberate indifference claim on the merits further supports the sufficiency of Busanet's pleading.

Taking as true the allegation that Wetzel expressed an understanding of the serious harm caused by solitary confinement throughout this investigation, along with the allegations supporting Wetzel's personal knowledge of Busanet's history of mental illness, I conclude that Busanet has pleaded a *prima facie* deliberate indifference claim dating as far back as Wetzel's 2011

appointment as Secretary of the DOC.  *See Clark*, 55 F.4th at 180-81 (holding that a plaintiff stated an Eighth Amendment deliberate indifference claim when he alleged that the DOC defendants were aware that he was seriously mentally ill and had known that placing him in solitary confinement would cause him to be severely and adversely affected).  Because a well-pled claim of deliberate indifference precludes the application of qualified immunity, dismissal of Busanet's Eighth Amendment claim is not warranted at this stage, regardless of when the right at issue became clearly established.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss will be granted in part and denied in part.  The statute of limitations does not bar Mr. Busanet's claim at this stage in the litigation.  Mr. Busanet's Fourteenth Amendment claim will be dismissed based on qualified immunity, but Wetzel's effort to dismiss Busanet's Eighth Amendment claim on the same grounds will be denied.  An appropriate order follows.

      /s/ Gerald Austin McHugh
       United States District Judge